# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MERION CAPITAL LP and MERION CAPITAL II LP, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 8900-VCG |
| BMC SOFTWARE, INC., | ) ) | |
| Respondent. | ) | |

## **MEMORANDUM OPINION**

Date Submitted: July 20, 2015
Date Decided: October 21, 2015

Stephen E. Jenkins, Steven T. Margolin, Marie M. Degnan, and Phillip R. Sumpter, of ASHBY & GEDDES, Wilmington, Delaware, *Attorneys for Petitioners*.

David E. Ross and S. Michael Sirkin, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Yosef J. Riemer, P.C., and Devora W. Allon, of KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Respondent*.

GLASSCOCK, Vice Chancellor

This case presents what has become a common scenario in this Court: a robust marketing effort for a corporate entity results in an arm's length sale where the stockholders are cashed out, which sale is recommended by an independent board of directors and adopted by a substantial majority of the stockholders themselves. On the heels of the sale, dissenters (here, actually, arbitrageurs who bought, not into an ongoing concern, but instead into this lawsuit) seek statutory appraisal of their shares. A trial follows, at which the dissenters/petitioners present expert testimony opining that the stock was wildly undervalued in the merger, while the company/respondent presents an expert, just as distinguished and learned, to tell me that the merger price substantially *exceeds* fair value. Because of the peculiarities of the allocation of the burden of proof in appraisal actions—essentially, residing with the judge—it becomes my task in such a case to consider "all relevant factors" and determine the fair value of the petitioners' shares.

Here, my focus is the fair value of shares of common stock in BMC Software, Inc. ("BMC" or the "Company") circa September 2013, when BMC was taken private by a consortium of investment firms (the "Merger"), including Bain Capital, LLC, Golden Gate Private Equity, Inc., and Insight Venture Management, LLC (together, the "Buyer Group"). Our Supreme Court has clarified that, in appraisal actions, this Court must not begin its analysis with a presumption that a particular valuation method is appropriate, but must instead examine all relevant

1

methodologies and factors, consistent with the appraisal statute.[1] Relevant to my analysis here are the sales price generated by the market, and the (dismayingly divergent) discounted cash flow valuations presented by the parties' experts (only Respondent's expert conducted an analysis based on comparable companies, and only as a "check" on his DCF valuation). Upon consideration of these factors in light of a record generated at trial, I find it appropriate to look to the price generated by the market through a thorough and vigorous sales process as the best indication of fair value under the specific facts presented here. My analysis follows.

## I. BACKGROUND FACTS[2]

*A. The Company*

### 1. The Business

BMC is a software company—one of the largest in the world at the time of the Merger—specializing in software for information technology ("IT") management.[3] Specifically, BMC sells and services a broad portfolio of software products designed to "simplif[y] and automate[] the management of IT processes, mainframe, distributed, virtualized and cloud computing environments, as well as

---

[1] 8 *Del. C.* § 262(h); *see Global GT LP v. Golden Telecom, Inc.*, 11 A.3d 214, 217–18 (Del. 2010).

[2] The following are the facts as I find them by a preponderance of the evidence after trial. Facts concerning the Company pertain to the period prior and leading up to the Merger. References in footnote citations to specific page numbers indicate the exhibit's original pagination, unless unavailable.

[3] JX 254 at 4.

applications and databases."[4]  In addition, the Company provides professional consulting services related to its products, including "implementation, integration, IT process, organizational design, process re-engineering and education services."[5] From fiscal years 2011 to 2013,[6] BMC's software sales, which it offers through either perpetual or term licenses, accounted for approximately 40% of total revenues, which share was steadily decreasing leading up to the Merger; BMC's maintenance and support services, which it offers through term contracts, accounted for approximately 50% of total revenues, which share was steadily increasing leading up to the Merger; and BMC's consultation services accounted for approximately 10% of total revenues, which share was also steadily increasing leading up to the Merger.[7]

The Company is organized into two primary business units:  Mainframe Service Management ("MSM") and Enterprise Service Management ("ESM").[8]  As explained by BMC's CEO and Chairman Robert Beauchamp, MSM consists primarily of two product categories:  mainframe products, which are designed to maintain and improve the efficiency and performance of IBM mainframe computers; and workload automation products, which are designed to orchestrate

---

[4] *Id.*
[5] *Id.* at 7.
[6] The Company's fiscal year runs from April 1 to March 31 of the following calendar year and is denoted by the calendar year in which it ends.  Trial Tr. 11:10–15 (Solcher).
[7] *See* JX 254 at 7.
[8] *Id.* at 5.

the multitude of back-end "jobs"—each a series of executions of specific computer programs—that a computer system must perform to carry out a complex computing process, such as a large corporation running its bi-weekly payroll.[9] ESM, on the other hand, is concerned more with providing targeted software solutions to a business's needs, and consists primarily of the Company's consulting division as well as three product categories: performance and availability products, which are designed to alert BMC's customers in real time as to delays and outages among their non-mainframe computer systems, and to diagnose and fix the underlying problems; data center automation products, which are designed to automate BMC customers' routine tasks concerning the design, construction, and maintenance of data centers, both in local data centers and cloud data centers; and IT service management products, which are designed to assist BMC's customers troubleshoot their own customers' IT problems.[10] In each of fiscal years 2011, 2012, and 2013, MSM and ESM accounted for approximately 38% and 62% of BMC's total revenues, respectively.[11]

2. Stunted but Stable Performance

Beauchamp and BMC's CFO Stephen Solcher both testified that, at the time of the Merger, BMC's business faced significant challenges to growth due to

---

[9] Trial Tr. 362:3–364:3 (Beauchamp); *see also* JX 254 at 6.
[10] Trial Tr. 367:8–370:10 (Beauchamp); *see also* JX 254 at 5–6.
[11] JX 254 at 85–86; *see also* Trial Tr. 364:4–8 (Beauchamp).

4

shifting technologies. Foremost, MSM was in a state of stagnation, as hardly any businesses were buying into the outdated, so-called "legacy" technology at the heart of MSM products and services—the IBM mainframe computer—and indeed some of BMC's MSM customers were moving away from mainframe technology altogether.[12] Even though the market's migration away from the heavily entrenched mainframe computer was expected to continue at only a crawl—in the words of Beauchamp, a "very slow, inexorable decline"—the steadily falling price of new mainframe computers meant that BMC still faced shrinking margins in renewing MSM product licenses with customers that stayed with the technology.[13] BMC had managed to ease the downward pressure on its MSM business by increasing the number of products it sold to each customer that remained with MSM,[14] but this side of the business remained flat, at best, in the years leading up to the Merger.[15]

As a result of the decline in mainframe computing, BMC had become entirely dependent on its ESM business for growth.[16] Specifically, Solcher identified ESM license bookings as the primary driver of growth for the

---

[12] *See* Trial Tr. 364:19–365:24 (Beauchamp); *id.* at 24:3–9 (Solcher).
[13] *Id.* at 364:22–23, 366:1–18 (Beauchamp).
[14] *Id.* at 366:19–367:7, 651:15–652:6 (Beauchamp).
[15] *See e.g.*, *id.* at 24:5–7 (Solcher).
[16] *See id.* at 23:22–24:9 (Solcher).

Company.[17]  However, the ESM side of BMC's business faced its own challenges, principally high levels of competition—from a handful of the most established software companies in the world to a sea of startups—brought on by the constant innovation of ESM technologies, which competition in turn created significantly lower margins on the ESM side of the business.[18]

Notwithstanding these challenges to its growth, BMC's business remained relatively stable leading up to the Merger, aided in part by BMC's role as an industry leader in several categories of products, in part by the overall diversity and "stickiness" of its products, and in part by its multiyear, subscription-based business model, which spreads its customer-retention risk over several years.[19]  In fiscal years 2011, 2012, and 2013, BMC generated total revenues of $2.07 billion, $2.17 billion, and $2.20 billion, respectively, and net earnings of $456.20 million, $401.00 million, and $331.00 million, respectively.[20]  During this period, total bookings remained essentially flat, while ESM license bookings fell 11.3% from fiscal years 2011 to 2012 and another 1.2% from fiscal years 2012 to 2013.[21]

---

[17] *Id.*  Bookings represent the contract value of transactions closed and recorded in any given period of time.  *E.g.*, JX 254 at 24; Trial Tr. 23:11–13 (Solcher).

[18] Trial Tr. 370:11–372:8 (Beauchamp); *see also id.* at 309:24–310:24 (Solcher) ("On the MSM side was where we had the larger margins.  We're 60-plus percent.  And on the ESM side, you're probably looking somewhere in the mid-20s.").

[19] *Id.* at 383:10–384:5 (Beauchamp).

[20] JX 254 at 56.

[21] JX 254 at 24; JX 39 at 23.

### 3. M&A Activity

The primary way that BMC has historically dealt with the high rate of innovation and competition in the IT management software industry is to lean heavily on mergers and acquisitions ("M&A") to grow and compete.[22] Along with a corporate department devoted solely to M&A, the Company maintained a standing M&A committee among its board of directors that met quarterly to oversee the Company's M&A activity (the "M&A Committee"), which Beauchamp explained was designed to spur the Company's management to continuously and rapidly seek out and execute favorable transactions.[23] Management played an active role in all M&A activity, but formal decision-making authority was stratified across the board, the M&A Committee, and management based on the size of potential transactions (as estimated by management): deals over $50 million were evaluated and recommended by the M&A Committee and had to be approved by the board as a whole; deals between $20 million and $50 million were evaluated by the M&A Committee and could be approved by that Committee without prior approval or consideration by the board; and transactions under $20 million could be evaluated and approved by management, without prior approval or consideration of the M&A Committee or

---

[22] *See*, *e.g.*, Trial Tr. 385:13–386:19 (Beauchamp); *id.* at 73:24–74:4, 91:8–16 (Solcher).
[23] *Id.* at 393:3–394:5 (Beauchamp); *see also id.* at 78:10–21 (Solcher).

the board.[24]

At trial, Beauchamp and Solcher both conceptually clustered the Company's M&A activity into two general categories, what they referred to as "strategic" transactions and "tuck-in" transactions.[25] As they described it, strategic transactions are large "move-the-needle type transactions,"[26] ones that would change the Company in a fundamental way, such as acquiring a new business unit.[27] These types of transactions were relatively rare for the Company, it having only engaged in one such acquisition in the five years leading up to the Merger— the approximately $800 million acquisition of a company called "BladeLogic" in fiscal year 2009, through which BMC acquired its current data center automation business.[28] Tuck-in transactions, on the other hand, are everything else—smaller transactions by which the Company would buy an individual product or technology that it could "tuck in" or "bolt on" to an existing business unit.[29]

---

[24] *See id.* at 548:21–556:16 (Beauchamp).

[25] *See*, *e.g.*, *id.* at 388:18–390:19 (Beauchamp); *id.* at 74:5–75:5 (Solcher).

[26] *Id.* at 86:19–24 (Solcher).

[27] *E.g.*, *id.* at 388:18–389:3 (Beauchamp).

[28] JX 204 at 4; Trial Tr. 387:6–388:17 (Beauchamp); *id.* at 75:20–23 (Solcher); *see also* JX 254 at 5 (describing the BladeLogic suite of products).

[29] *E.g.*, Trial Tr. 390:7–16 (Beauchamp); *id.* at 74:5–75:5 (Solcher). At trial, the Petitioners stressed the fact that the M&A Committee in its meeting presentation materials had consistently used a different, value-based categorization for M&A deals in describing BMC's M&A pipeline: deals over $300 million were labeled as "scale," deals over $100 million were labeled as "product," and deals under $50 million were labeled as "tuck-in." *See*, *e.g.*, *id.* at 163:13–173:5 (Solcher). However, as my analysis below illustrates, the Petitioners' focus on this semantic difference misses the point. For the sake of this appraisal, I am concerned with how those who prepared the projections that will be used in my valuation (*i.e.*, management) conceptualized BMC's M&A activity, in order to understand how M&A activity was forecasted in those

As explained by Beauchamp and Solcher, it was these latter, smaller acquisitions that formed the basis of BMC's inorganic growth strategy.[30] The Company carried out over a dozen tuck-in transactions in the years leading up to the Merger: three deals totaling $117 million in fiscal year 2008; one deal totaling $6 million in fiscal year 2009, the same year of the $800 million acquisition of BladeLogic; three deals totaling $97 million in fiscal year 2010; two deals totaling $54 million in fiscal year 2011; six deals totaling $477 million in fiscal year 2012; and one deal totaling $7 million in fiscal year 2013, the year in which BMC began and ran much of the sales process for the Merger.[31] Beauchamp and Solcher explained that, had the Company remained public, it had every intention of continuing its tuck-in M&A activity into the future,[32] and indeed the M&A

projections and to what extent the forecasts are reasonable. Thus, in this Memorandum Opinion, I adopt management's nomenclature in reference to BMC's M&A activity, referring to transactions so significant that they change the Company's business in a fundamental way—those valued at over $300 million and labeled "scale" by the M&A Committee—as "strategic" and to all other transactions as "tuck-in." *See*, *e.g.*, *id.* at 86:7–87:18 (Solcher).

[30] *See id.* at 390:7–19 (Beauchamp) ("Q: . . . [W]hat do you think of when you're talking about tuck-in? A: Well, tuck-in is . . . if you're the president or the general manager of one of these units, you have a whole set of competitors and things are changing pretty quickly. And you also have a lot of customers telling you, 'We want this and we want that.' You have regular meetings with your customers. You either have to build those features or you have to go buy those features. And so tuck-ins, to me, is responding to the competitive pressures or the customer demands by using build versus buy. And frequently we use buy."); *id.* at 74:22–75:5 (Solcher) ("Q: . . . [W]hy was tuck-in important at BMC? A: Well, we had to fill out our portfolio, for one. We had to acquire talent. This industry is rapidly evolving, and tech is something that you've got to constantly be thinking about the next move you're going to make. So we're always looking for that next widget to go acquire, whether it be the individual or the actual technology itself.").

[31] *See* JX 204 at 4.

[32] *E.g.*, Trial Tr. 85:5–93:5 (Solcher); *id.* at 392:16–20 (Beauchamp).

9

Committee's presentation materials throughout fiscal year 2013 and into fiscal year 2014, after BMC had agreed to the Merger, identified dozens of tuck-in merger targets of varying sizes and stages of development in the Company's M&A pipeline.[33]

### 4. Stock-Based Compensation

Like many technology companies, in order to attract and maintain talented employees, BMC compensated a significant portion of their employees using stock-based compensation ("SBC").[34] The Company had two forms of SBC: (1) time-based stock options that vested over a specific period of time, which the Company valued using the price of BMC's stock on the date of the grant;[35] and (2) performance-based stock options, reserved for select executives, that vested based on the performance of BMC's stock compared to a broad index and were valued using a Monte Carlo simulation which accounted for the likelihood that the performance targets would be met.[36] The Company expensed the fair value of the stock options, less expected amount of forfeitures, on a straight-line basis over the vesting period.[37] SBC expense grew substantially each year and in 2013 was

---

[33] *See* JX 204 at 11; JX 312 at 10.
[34] Solcher testified that approximately 20% of BMC's employees were compensated, in part, by SBC. Trial Tr. 42:3–16 (Solcher).
[35] *Id.* at 45:2–46:12 (Solcher); JX 254 at 78–79.
[36] Trial Tr. 45:5–46:6 (Solcher); JX 254 at 78–79.
[37] Trial Tr. 45:2–46:18 (Solcher); JX 254 at 78–79.

approximately seven percent as a percentage of revenue.[38]

Because the Company believed SBC was vital to maintaining the strength of its employee base, management had no plans to stop issuing SBC had it remained a public company.[39]

### 5. Financial Statements

#### a. Regular Management Projections

BMC in the ordinary course of business created financial projections—which it called its "annual plan"[40]—for the upcoming fiscal year.[41] Under the oversight of Solcher,[42] management began formulating its annual plan in October using a bottom-up approach that involved multiple layers of management representing each business unit.[43] Preliminary projections were presented to the board in the fourth quarter,[44] who then used a top-down approach to provide input before the annual plan was finalized.[45]

The annual plan was limited to internal use and represented optimistic goals

---

[38] Trial Tr. 43:14–18 (Solcher).
[39] *Id.* at 42:12–43:7 (Solcher).  Additionally, in order to avoid dilution of the Company's shares, each time the Company issued stock pursuant to SBC it would also buy BMC stock in the open market.  *Id.* at 46:19–47:7 (Solcher).
[40] *See, e.g., id.* at 329:4–10 (Solcher).
[41] *Id.* at 11:16–18 (Solcher).
[42] *Id.* at 11:23–12:3 (Solcher).
[43] *Id.* at 12:4–13:9 (Solcher).
[44] *Id.* at 12:8–12 (Solcher).
[45] *Id.* at 16:19–17:4 (Solcher).

that set a high bar for future performance.[46] Although management intended the projections to be a "stretch" and the Company often did, in fact, fail to meet its goals, management maintained that meeting the projections included in its annual plan was always attainable.[47]

Also in October of each year, BMC would begin to prepare high-level three-year projections that were not as detailed as the one-year annual plan.[48] Additionally, as part of a separate process, the finance group prepared detailed three-year projections that Solcher presented to ratings agencies, usually on an annual basis.[49] Although the projections presented to the ratings agencies were prepared in the ordinary course of business, they were prepared under the direction of Solcher and were not subject to the same top-down scrutiny as the high-level three-year projections.[50]

b. Reliability of Projected Revenue from Multiyear Contracts

Although management's projections required many forecasts and assumptions, BMC benefited from the predictability of their subscription-based

---

[46] *Id.* at 13:24–14:13 (Solcher).

[47] *Id.* at 13:24–16:15 (Solcher).

[48] *See, e.g.*, *id.* at 264:11–268:22 (Solcher) ("Q: In the regular course of its business, did BMC management prepare statements of cash flows that projected out three years? A: We projected out *captions* within a statement of cash flow . . . Q: So what you did internally was . . . a six-line cash flow statement, not a 20-line cash flow statement. A: Right.") (emphasis added); *see also, e.g., id.* at 276:8–16 (Solcher) ("I just would characterize it that the board and the rest of the management team did [three-year projections] at a very high level in the October time frame.").

[49] *Id.* at 270:21–273:20 (Solcher).

[50] *See id.* at 276:12–277:19 (Solcher).

business model. A significant amount of the Company's revenue derived from multiyear contracts that typically spanned a period of five to seven years.[51] Depending on the nature of the contract, the Company did not immediately recognize revenue for the entire contract price in the year of sale.[52] Instead, general accounting principles dictated that the sales price be proportionately recognized over the life of the contract.[53] Therefore, upon the signing of certain multiyear contracts—such as an ESM or MSM software license[54]—the Company recorded deferred revenue as an asset on the balance sheet and then, in each year for the life of the contract, recognized revenue for a portion of the contract.[55] As a result, management was able to reliably predict a significant portion of revenue from multiyear contracts many years into the future.

### c. Management Projections Leading Up to the Merger

BMC created multiple sets of financial projections leading up to the Merger. In July 2012, BMC began preparing detailed multiyear projections as the Company began exploring various strategic alternatives, including a potential sale of the Company.[56] Building off of the 2013 annual plan, management created three-year

---

[51] *Id.* at 23:22–25:1 (Solcher).
[52] *Id.* at 24:13–25:1 (Solcher); *id.* at 384:6–24 (Beauchamp).
[53] *Id.* at 384:6–20 (Beauchamp); JX 254 at 27–28.
[54] According to the Company's 2013 Form 10-K, of the software license transactions recorded in fiscal years 2011, 2012, and 2013, only 51%, 54%, and 54% of the transactions were recognized as license revenue upfront in each of those years, respectively. JX 254 at 27.
[55] Trial Tr. 384:6–20 (Beauchamp); *id.* at 24:13–25:1 (Solcher); JX 254 at 27–28.
[56] Trial Tr. 32:8–19 (Solcher).

13

financial projections using a similar top-down and bottom-up approach that was historically employed to create the Company's internal annual plan.[57] Consistent with their regular approach, management used optimistic forecasts in their detailed multiyear projections.[58] In October 2012, management finalized their first set of projections (the "October Projections") that were included in a data pack used by the financial advisors to shop the Company.[59]

As discussed in more detail below, the Company quickly abandoned their initial efforts to sell the company. In January 2013, however, following poor financial results in the third quarter, BMC again decided to explore strategic alternatives, requiring management to update the October Projections.[60] In February, using the same approach, the Company revised the multiyear projections (the "February Projections"), resulting in lower projected results that were provided to the financial advisors to create a second data pack.[61] Finally, in April, management provided the financial advisors a slight update to their projections (the "April Projections"), on which the financial advisors ultimately based their fairness opinion and used to create a final data pack.[62] The financial advisors also

---

[57] *Id.* at 34:2–16 (Solcher). Solcher testified at trial that, although both approaches were used, projections for years two and three were generated using mainly a top-down approach. *Id.* at 34:15–6 (Solcher).

[58] *Id.* at 34:17–35:8 (Solcher).

[59] *Id.* at 33:6–34:1 (Solcher); *see also* JX 88.

[60] Trial Tr. 36:12–37:6 (Solcher).

[61] *Id.* at 36:12–38:12 (Solcher); *see also* JX 146.

[62] Trial Tr. 38:13–39:11 (Solcher); *see also* JX 210.

14

extrapolated the April Projections to extend the forecast period an additional two years, creating a total of five years of projections that were provided to potential buyers.[63]

### d. SBC in Management Projections

As I have described above, SBC was an integral part of BMC's business before the Merger and management had no reason to believe that SBC would decrease if the Company had remained public. Additionally, because BMC had a regular practice of buying shares to offset dilution, management believed SBC was a true cost and, therefore, included SBC expense in their detailed projections.[64] With the help of human resources and third-party compensation consultants, management projected SBC expenses of $162 million for both fiscal years 2014 and 2015, and $156 million for fiscal year 2016.[65]

### e. M&A in Management Projections

Management believed tuck-in M&A was integral to the Company's revenue growth and, therefore, its projected revenues took into account continued growth

---

[63] *See* Trial Tr. 40:21–24 (Solcher).

[64] *See id.* at 47:15–49:20 (Solcher) ("We had a historical practice of offsetting that dilution. So . . . it's cash out the door.").

[65] *Id.* at 47:15–49:20 (Solcher); JX 225 at 32. Although management and the financial advisors believed that the inclusion of SBC was the most accurate way to present BMC's financial projections, most of the presentations, as well as the proxy, also included financial projections that were "unburdened" by SBC. Trial Tr. 48:20–52:3 (Solcher). According to the proxy statement, the board requested that the financial advisors perform for "reference and informational purposes *only*" discounted cash flow analysis that included, among other changes, financial projections unburdened by SBC. *Id.* at 51:10–52:3 (Solcher) (emphasis added); JX 284 at 59.

15

from tuck-in M&A transactions.[66] Furthermore, management believed that BMC would continue investing in tuck-in M&A if it had remained a public company.[67] Since growth from tuck-in M&A was built into their revenue projections, management also included projected tuck-in M&A expenditures.[68] Larger strategic deals, however, were too difficult to predict and were, therefore, excluded from management's projections.[69] Based on the first three quarters of M&A activity in fiscal year 2014, management projected $200 million in total tuck-in M&A expense for fiscal year 2014 and, based on the Company's historical average tuck-in M&A activity, management projected $150 million in M&A expenditures for both fiscal years 2015 and 2016.[70]

### B. The Sales Process

#### 1. Pressure from Activist Stockholder

In May 2012, in response to "sluggish growth" and "underperformance,"

---

[66] Trial Tr. 91:13–92:1 (Solcher) (describing M&A as part of the Company's "core fabric").

[67] *Id.* at 92:24–93:5 (Solcher). BMC did reduce actual M&A activity in January 2013. This was not a permanent shift in the Company's strategy, but was instead an intentional and temporary reduction in spending in order to conserve cash in anticipation of closing the Merger. *See id.* at 88:16–89:13 (Solcher); *id.* at 392:21–393:21 (Beauchamp).

[68] *See, e.g.*, *id.* at 81:15–82:9, 85:16–86:1 (Solcher). Despite management's repeated testimony that tuck-in M&A was necessary to the Company's revenue projections, Petitioners argue that certain presentations made to potential buyers and lenders described M&A as "upside" to management's base projections and were, therefore, not already included. *See* Pet'r's Opening Post-Trial Br. at 17–19. Management, however, included a separate line item for M&A expenditures in its projections which informed each of the three data packs used during the sales process. *See* JX 88 at 6 (October Projections); JX 146 at 7 (February Projections); JX 210 at 6 (April Projections).

[69] Trial Tr. 77:21–23 (Solcher).

[70] *Id.* at 80:14–81:24 (Solcher); JX 146 at 7.

activist investors Elliott Associates, L.P. and Elliott International, L.P. (together, "Elliot") disclosed that Elliot had increased its equity stake in BMC to 5.5% with the intent to urge the Company to pursue a sale.[71] To accelerate a sales process, Elliott commenced a proxy contest and proposed a slate of four directors to be elected to BMC's board.[72] According to Beauchamp, BMC's CEO, Elliot's engagement had a negative impact on the Company's business operations: BMC's competitors used customer concerns as a tool to steal business; it hurt BMC's ability to recruit and retain sales employees; and it generally damaged BMC's reputation in the marketplace.[73]

On July 2, 2012, after discussions with other large stockholders, BMC agreed to a settlement with Elliott that ended its proxy contest.[74] Under the settlement, the Company agreed to increase the size of the board from ten to twelve directors and to nominate John Dillion and Jim Schaper—two members of Elliott's proposed slate—as directors at the upcoming annual meeting.[75] In return, Elliott agreed to immediately terminate its proxy contest and agreed to a standstill agreement that restricted Elliott's ability to initiate similar significant stockholder engagement moving forward.[76]

---

[71] *See* JX 43.
[72] *See id.*
[73] Trial Tr. 526:9–527:20 (Beauchamp).
[74] *See id.* at 396:1–399:7 (Beauchamp); JX 57.
[75] *See* JX 57.
[76] *See id.*

17

## 2. The Company on the Market

### a. The First Auction

In July 2012, in conjunction with its settlement with Elliott, BMC's board formed a committee (the "Strategic Review Committee") to explore all potential strategic options that could create shareholder value, including a sale.[77] BMC retained Bank of America Merrill Lynch to help explore strategic options and to alleviate any concerns that Morgan Stanley, the Company's longstanding financial advisor, was too close to management.[78]

On August 28, 2012, the board instructed Beauchamp to begin contacting potential strategic buyers and instructed the team of financial advisors to begin contacting potential financial buyers to gage their interest in an acquisition.[79] Even though all potential strategic buyers ultimately declined to submit an initial indication of interest, BMC received two non-binding indications of interest from potential financial buyers: one from Bain Capital, LLC ("Bain") for $45-47 per share and one for $48 per share from a team of financial sponsors (the "Alternate Sponsor Group").[80]

The Strategic Review Committee evaluated the indications of interest and, encouraged by BMC's improved financial results in the second quarter of fiscal

---

[77] Trial Tr. 395:10–24, 399:23–400:14 (Beauchamp).
[78] *Id.* at 401:17–403:4 (Beauchamp).
[79] *Id.* at 403:17–408:23 (Beauchamp); JX 68 at 2.
[80] Trial Tr. 409:19–410:6 (Beauchamp); JX 284 at 27.

year 2013,[81] unanimously recommended that the board reject the offers.[82] On October 29, 2012, the board unanimously rejected a sale of the Company and, instead, approved a $1 billion accelerated share repurchase plan that was publicly announced two days later.[83]

### b. The Second Auction

Despite the Company's renewed confidence following improved quarterly results, in December 2012 Elliott sent a letter to the board that expressed continued skepticism of management's plans and reiterated its belief that additional drastic measures, like a sale, were required to maximize stockholder value.[84] Shortly thereafter, BMC reported sluggish third quarter financial results which revealed that management's previous financial projections—specifically ESM license bookings—had been overly optimistic.[85]

The board called a special meeting on January 14, 2013 to reevaluate their options, which included three strategic opportunities: (1) a strategic acquisition of Company A, another large software company; (2) a modified execution plan that included less implied growth and deep budget cuts; and (3) a renewed sales process targeted at the previously interested financial buyers.[86] The board decided to

---

[81] *See* Trial Tr. 412:8–24 (Beauchamp); JX 104.
[82] Trial Tr. 410:7–411:13 (Beauchamp).
[83] *Id.* at 411:14–413:7 (Beauchamp); JX 105.
[84] Trial Tr. 417:6–20 (Beauchamp); JX 112.
[85] Trial Tr. 417:21–418:19 (Beauchamp).
[86] *Id.* at 420:1–421:20 (Beauchamp); JX 116.

pursue all three strategies. In late January, building on previous consulting work provided by BMC's management consultants, the Company began implementing Project Stanley Cup, which mainly focused on reducing costs to increase BMC's margins and earnings per share.[87] In addition, the Company reached out to Company A regarding a potential acquisition of Company A by BMC. Although their initial meetings led to preliminary interest, the diligence efforts moved slowly and finally, following Company A's poor financial performance, BMC abandoned their pursuit of an acquisition.[88]

In March 2013, after contacting potential financial buyers,[89] the Company received expressions of interest from three buyers: one from a new financial sponsor ("Financial Sponsor A") for $42-44 per share, one from the Alternate Sponsor Group for $48 per share, and one from Bain, who had received permission to partner with Golden Gate to form the Buyer Group, for $46-47 per share.[90] Despite encouragement from BMC's financial advisors, Financial Sponsor A declined to increase its bid and was, therefore, not invited to proceed with due

---

[87] *See* JX 120.

[88] Negotiations with Company A ended in April 2013. *See* Trial Tr. 429:16–430:6 (Beauchamp); JX 284 at 31–33.

[89] *See* Trial Tr. 423:21–424:5. BMC did not reach out to potential strategic buyers in the second auction because it did not receive any indications of interest in the first auction and, considering it had just released negative financial results, BMC believed that a strategic buyer would only show interest if it could obtain an extremely low price. *Id.* at 425:4–20 (Beauchamp).

[90] *Id.* at 426:19–427:11 (Beauchamp); JX 225 at 3.

diligence.[91]   In early April, the Alternate Sponsor Group told the Company's financial advisors that it could not make the April 22 deadline the Company had established and needed more time to complete due diligence.[92]   The board decided that it was important to keep the Alternate Sponsor Group engaged and thus continue negotiations.[93]   On April 18, one of the financial sponsors dropped out of the process leaving its former partner to consider proceeding with a valuation that was closer to the then current trading price of $43.75 and requesting an extension of one month to submit a bid.[94]

On April 24, 2013, the Buyer Group submitted a bid of $45.25.[95] Over the next two days, the board met with the financial advisors to consider the developments and voted to create an ad hoc planning committee to review alternative options in the event a transaction was not approved or failed to close.[96] On April 26, the financial advisors requested that the Buyer Group increase their price to at least $48 and that their bid also include a 30-day go-shop period.[97]   On that same day, the Buyer Group responded with a counteroffer of $45.75 that included a 30-day go-shop period.[98]   Following further pushback from BMC's

---

[91] Trial Tr. 431:1–9 (Beauchamp); JX 284 at 31.
[92] JX 196 at 2.
[93] *Id.*
[94] Trial Tr. 431:1–13 (Beauchamp); JX 465 at 1.
[95] Trial Tr. 431:14–17 (Beauchamp).
[96] *Id.* at 433:10–434:8 (Beauchamp); JX 464 at 1–5.
[97] *See* Trial Tr. 431:14–432:12 (Beauchamp); JX 284 at 34–35.
[98] *See* Trial Tr. 432:13–433:1 (Beauchamp); JX 284 at 35.

financial advisors, on April 27, the Buyer Group responded with their final offer of $46.25.[99]

### 3. The Company Accepts the Buyer Group's Offer

Starting on April 27, 2013 and continuing over the next few days, the board met with the financial advisors to discuss the details of the Buyer Group's final offer, which included: a 30-day go-shop period that started upon signing the Merger agreement; a two-tiered termination fee of a 2% and 3%; and a 6% reverse termination fee.[100] On May 3, the financial advisors presented their fairness opinion to the board, opining that the transaction was fair from a financial standpoint.[101] On that same day, the board approved the signing of the Merger agreement and recommended that BMC's stockholders approve the Merger, which was formerly announced on May 6.[102]

The go-shop period lasted from May 6, 2013 through June 5, 2013.[103] During this period, the financial advisors contacted both financial and strategic entities—many of whom were contacted during the first and second sales processes[104]—and, in addition, the board waived any provisions pursuant to standstill agreements that would have prohibited a potential bidder from

---

[99] Trial Tr. 432:13–433:9 (Beauchamp); JX 284 at 35.
[100] JX 284 at 35.
[101] Trial Tr. 436:5–15 (Beauchamp); JX 229 at 1.
[102] Trial Tr. 441:6–11 (Beauchamp); JX-229 at 3–9.
[103] JX 284 at 37.
[104] Trial Tr. 442:19–444:13 (Beauchamp).

reengaging with the Company.[105] Despite these efforts, only two parties entered into confidentiality agreements and, ultimately, no alternative proposals were submitted.[106]

On May 10, 2013, a group of stockholders brought a breach of fiduciary duty action to challenge the sales process.[107] On June 25, BMC filed its definitive proxy statement that urged stockholders to vote in favor of the Merger.[108] The stockholders approved the transaction on July 24 with 67% of the outstanding shares voting in favor.[109] On September 10, the Merger closed. On April 28, 2014 this Court approved a settlement between stockholders and the Company and described the sales process as fair and the *Revlon* claims as weak.[110]

*C. The Expert Opinions*

The Petitioners' expert witness, Borris J. Steffen, exclusively relied on the discounted cash flow ("DCF") method and determined that the fair value of BMC was $67.08 per share;[111] that is, 145% of the Merger price and 148% of the pre-

---

[105] *Id.* at 444:21–445:3 (Beauchamp).

[106] JX 284 at 37.

[107] The cases were consolidated as *In re BMC Software, Inc. S'holder Litig.*, 8544-VCG (Del. Ch. June 6, 2013).

[108] *See* JX 284.

[109] *See* JX 316.

[110] *See In re BMC Software, Inc. S'holder Litig.*, 8544-VCG (Del. Ch. Apr. 28, 2014) (TRANSCRIPT).

[111] Trial Tr. 831:11–832:9 (Steffen); JX 386 ¶ 109.

announcement market price.[112]  Steffen considered using other methodologies, such as the comparable company method and the comparable transaction method, but ultimately decided that those methodologies were not appropriate given the specific facts in this case.[113]

The Respondent's expert witness, Richard S. Ruback, similarly relied on the DCF method to conclude that the fair value of BMC was $37.88 per share,[114] 16% below the pre-announcement market price and little more than half the fair value as determined by Steffen.  In addition, Ruback performed two "reality checks" to test his DCF valuation for reasonableness: first, he performed a DCF analysis using projections derived from a collection of Wall Street analysts that regularly followed the Company, which he called the "street case"; second, he performed a comparable companies analysis using trading multiples from selected publicly-traded software companies.[115]

Although the difference between the experts' estimates is large, the contrasting prices are the result of a few different assumptions, which I now describe below.[116]

---

[112] The Company's common stock closed at $45.42 on May 3, 2013, the last day trading day before the merger was announced.  JX 284 at 105.

[113] Trial Tr. 832:15–834:4 (Steffen); JX 386 ¶ 16–21.

[114] JX 383 at ¶ 68.

[115] Trial Tr. 1028:11–1030:12 (Ruback); JX 383 at ¶¶ 68–69.

[116] In addition to the diverging key assumptions described in detail here, Steffen included an adjustment for additional cost savings that neither management nor Ruback included.  Steffen believed—based on his interpretation of a chart presented to potential buyers—that certain cost

1. <u>Financial Projections</u>

Steffen based his calculation of free cash flow on management's projections for 2014 through 2018 that BMC reported in its proxy statement dated June 25, 2013.[117] He concluded the use of management's projections was reasonable based on his analysis of other contemporaneous projections prepared by management; BMC's historical operating results; and the economic outlook for the software industry.[118]

Ruback, however, concluded that management's projections were biased by "overoptimism" and, therefore, reduced management's revenue projections used in his calculation of free cash flow by 5%.[119] He believed this reduction was appropriate because, although management thought their projections were

savings were misidentified by management as "public-to-private" savings and thus improperly excluded from management's projections. *Id.* at 866:18–867:19 (Steffen); JX 386 ¶ 110–113. But at trial, Solcher testified that management had already implemented and included in its projections all cost saving strategies that it believed were available to BMC as a public company. Trial Tr. 58:12–59:11 (Solcher); *see also id.* 64:3–68:9 (Solcher) (specifically referring to those cost savings identified by Steffen). Without more evidence that management misclassified these expenses, Steffen's decision to include additional cost savings appears to be overly speculative and, therefore, my DCF analysis does not include a similar adjustment.

[117] Trial Tr. 837:5–11 (Steffen).

[118] *Id.* at 844:18–845:10 (Steffen). Steffen did not form an opinion as to whether BMC was more likely or not to meet its projections, but instead relied on management's assertion that they were reasonable. *Id.* at 846:16–22 (Steffen).

[119] *Id.* at 1031:18–24 (Ruback). Ruback calculated the average amount by which the Company failed to meet their projections; he first recognized management's alleged bias after BMC's financial performance for the quarter following the announcement of the Merger fell short of management's projections and also after hearing Solcher's deposition where he characterized management's forecasts as a "stretch." *Id.* at 1032:1–1034:24 (Ruback).

25

"reasonable," a DCF model requires projections that are expected.[120] Ruback's adjustment decreased his valuation by approximately $2.82 per share.[121]

### 2. Discount Rate

Steffen used a discount rate of 10.5% while Ruback used a discount rate of 11.1%. The difference in discount rates is almost entirely explained by the experts' contrasting views of the equity risk premium ("ERP"). Steffen calculated his discount rate using a supply-side ERP of 6.11%, which he believed was preferable since valuation calculations are forward-looking.[122] Ruback calculated his discount rate using the long-run historical ERP of 6.7%.[123] Ruback used the long-run historical ERP because he believed it is the most generally accepted ERP and that any model that attempts to estimate future ERP is subject to intolerable estimation errors.[124]

### 3. Terminal Growth Rate

Steffen selected a long-term growth rate of 3.75%.[125] To determine this number, Steffen first created a range of rates between expected long-run inflation of 2% and nominal GDP rate of 4.5%.[126] Steffen ultimately concluded that BMC's

---

[120] *Id.* at 1036:3–19 (Ruback).
[121] *Id.* at 1050:4–17 (Ruback).
[122] *Id.* at 969:15–970:7 (Steffen); JX 386 at ¶ 94. Steffen also cited his belief that Delaware law dictated the use of a supply-side ERP in *Golden Telecom*. *See* Trial Tr. 969:15–970:7 (Steffen).
[123] *Id.* at 1056:18–1057:14 (Ruback).
[124] *Id.* at 1061:10–1063:7 (Ruback).
[125] JX 386 ¶ 87.
[126] Trial Tr. 848:14–849:17 (Steffen).

long-term growth rate would be 50 basis points greater than the midpoint between this range.[127] Ruback used a rate of inflation of 2.3% as his long-term growth rate because he believed that the real cash flows of the business would stay constant in the long run;[128] he viewed BMC as a "mature software business" in a "mature part of the software industry."[129]

### 4. Excess Cash

Steffen used an excess cash value of $1.42 billion, which he calculated by reducing cash and cash equivalents as of September 10, 2013 by the minimum cash required for BMC to operate of $350 million.[130] Steffen did not account for repatriation of foreign cash because he believed that it was the Company's policy—as publicly disclosed in its 10-K filings—to maintain its cash balance overseas indefinitely.[131]

Ruback started with cash and cash equivalents as of June 30, 2013[132] and, in addition to the same $350 million deduction for required operating expenses, further reduced excess cash by $213 million to account for the tax consequences of

---

[127] See *id.* at 849:13–17 (Steffen).
[128] *Id.* at 1050:19–1051:20 (Ruback). Ruback tested the reasonableness of his growth rate by comparing it to other growth rates that he implied from exit multiples used by the financial advisors and the multiples used in his comparable company analysis. *Id.* at 1051:21–1056:17 (Ruback). Ultimately, Ruback noted that both experts in this case used a growth rate that was greater than those he implied in his reasonableness analysis. *Id.*
[129] JX 383 ¶ 37.
[130] Trial Tr. 858:3–8 (Steffen).
[131] *Id.* at 858:9–21 (Steffen).
[132] *Id.* at 1156:8–13 (Ruback).

repatriating the cash held in foreign jurisdictions that the Company would be forced to pay tax in order to access it in the United States.[133]

5. Stock-Based Compensation

Steffen's analysis did not account for SBC in his free cash flow projections.[134] Instead, Steffen calculated shares outstanding using the treasury stock method, which increases the number of shares outstanding to account for the dilutive economic effect of share-based compensation that has already been awarded.[135]

Conversely, Ruback included SBC as a cash expense that directly reduced his free cash flow projections.[136] Ruback used management's estimates of future SBC expense—an accounting value—to directly reduce free cash flow.[137] The difference between the two approaches is that Steffen's analysis accounts for SBC that had been awarded as of the date of his report, whereas Ruback's analysis also accounts for SBC that is expected to be issued in the future.

---

[133] *Id.* at 1065:12–21, 1163:8–19 (Ruback).
[134] *Id.* at 998:21–1000:3 (Steffen).
[135] *Id.* at 859:3–7 (Steffen) The treasury stock method assumes that all stock options are exercised immediately—thus resulting in the issuances of new shares—and the cash proceeds received from the exercise are used to repurchase shares, the net of effect of which increases the number of shares outstanding and, in turn, decreases the value per share. *See id.* at 859:8–20.
[136] *Id.* at 1015:13–1016:10 (Ruback). Ruback illustrated his belief that SBC expense is a reduction in the value of the Company by showing that a hypothetical company would supposedly lose the same amount of value if it compensated its employees in cash or in stock. *See id.* at 1017:9–1023:12 (Ruback).
[137] *Id.* at 1152:23–1153:14 (Ruback).

### 6. M&A Expenses

Steffen did not deduct M&A expenditures from free cash flow. He believed that management's projections were not dependent on M&A activity since he did not find that management deducted M&A expenditures in their own analysis.[138] Ruback, on the other hand, did include management's projections of M&A expenditures in his valuation. Ruback believed that management's revenue projections included the impact of tuck-in M&A and that the Company planned to continue tuck-in M&A activity if it remained a public company.[139] Moreover, although the financial advisors did not include M&A expenditures for years 2017 and 2018—these being the years the financial advisors extrapolated from management's projections—Ruback used the same $150 million in M&A expenditures projected for 2016 in his projections for year 2017, 2018, and the terminal period.[140]

### D. Procedural History

On September 13, 2013, Petitioners Merion Capital LP and Merion Capital II LP commenced this action by filing a Verified Petition for Appraisal of Stock pursuant to 8 *Del. C.* § 262. Immediately prior to the Merger, Petitioners owned 7,629,100 shares of BMC common stock. On July 28 2014, Respondent BMC

---

[138] *Id.* at 870:15–871:12 (Steffen).
[139] *Id.* at 1025:10–21 (Ruback).
[140] *Id.* at 1026:10–1027:2 (Ruback).

filed a Motion for Summary Judgment, arguing that Petitioners lacked standing to pursue appraisal because they could not show that each of their shares was not voted in favor of the Merger. I denied the Motion in a Memorandum Opinion dated January 5, 2015.[141]

I presided over a four-day trial in this matter from March 16 to March 19, 2015. The parties submitted post-trial briefing and I heard post-trial oral argument on June 23, 2015. Finally, in July the parties submitted supplemental post-trial briefing regarding the treatment of synergies. This is my Post-Trial Opinion.

## II. ANALYSIS

The appraisal statute, 8 *Del. C.* § 262, is deceptively simple; it provides stockholders who choose not to participate in certain merger transactions an opportunity to seek appraisal in this Court. When a stockholder has chosen to pursue its appraisal rights, Section 262 provides that:

> [T]he Court shall determine the *fair value* of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account *all relevant factors*.[142]

Section 262 vests the Court with significant discretion to consider the data and use the valuation methodologies it deems appropriate. For example, this Court

---

[141] *See Merion Capital LP v. BMC Software, Inc.*, 2015 WL 67586 (Del. Ch. Jan. 5, 2015).
[142] 8 *Del. C.* § 262(h) (emphasis added).

30

has the latitude to select one of the parties' valuation models as its general framework, or fashion its own, to determine fair value. The principal constraint on my analysis is that I must limit my valuation to the firm's value as a going concern and exclude "the speculative elements of value that may arise from the accomplishment or expectation of the merger."[143]

Ultimately, both parties bear the burden of establishing fair value by a preponderance of the evidence. In assessing the evidence presented at trial, I may consider proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court. Among the techniques that Delaware courts have relied on to determine the fair value of shares are the discounted cash flow approach, the comparable transactions approach, and comparable companies approach. This Court has also relied on the merger price itself as evidence of fair value, so long as the process leading to the transaction is a reliable indicator of value and any merger-specific value in that price is excluded.

Here, the experts offered by both parties agreed that the DCF approach, and not the comparable transactions or comparable companies approach, is the appropriate method by which to determine the fair value of BMC. Thus, I will start my analysis there.

---

[143] *Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del. 1983) (quotations omitted).

*A. DCF Analysis*

In post-trial briefing and at closing argument, the parties helpfully laid out the limited areas of disagreement between their two experts as to DCF inputs. I will briefly explain my findings with respect to those areas in contention, but I note at the outset that, while I have some disagreements with the Respondent's expert, Ruback, I generally found him better able to explain—and defend—his positions than the Petitioners' expert, Steffen. Since I generally find Ruback more credible, I start with his analysis as a framework, departing from it as noted below.

### 1. Financial Projections

The parties' experts both relied on the same management projections. Ruback, however, made a 5% reduction to projected revenue based on his analysis that the Company had historically fallen short of its projected revenues. Although it is apparent to me that the management projections, while reasonable, harbored something of a bias towards optimism, I ultimately find Ruback's approach too speculative to accurately account for that bias. Thus, in conducting my own DCF valuation of the Company, I use the management projections as is, *without* a 5% deduction.

### 2. Discount Rate

The parties contend that the key difference in their experts' respective discount rates is that the Petitioners' expert used a supply side ERP, while the

Respondent's expert used a historical ERP. This calculation is forward-looking, and this Court has recently tended to employ the supply side ERP approach. In then-Chancellor Strine's decision in *Global GT LP v. Golden Telecom, Inc.*,[144] this Court noted that using the supply side ERP as opposed to the historical ERP is a decision "not free from doubt," but it nevertheless adopted it over a historical ERP as a more sound approach.[145] The Chancellor followed that approach again in *In re Orchard Enterprises*,[146] where he noted that the respondent there had "not provided [him] with a persuasive reason to revisit" the debate.[147] In other cases, this Court has explicitly adopted a supply side ERP.

While it may well be the case that there is an argument in favor of using the historical ERP, nothing in Ruback's testimony convinces me to depart from this Court's practice of the recent past. I note, however, that the testimony at trial showed this to be a vigorously debated topic, not just between these two experts, but in the financial community at large; scholarship may dictate other approaches in the future. Here, though, I ultimately find the most appropriate discount rate, using the supply side ERP, to be 10.5%.[148]

---

[144] 993 A.2d 497 (Del. Ch.), *aff'd,* 11 A.3d 214 (Del. 2010).
[145] *Id.* at 516.
[146] 2012 WL 2923305 (Del. Ch. July 18, 2012).
[147] *Id.* at *19.
[148] I find it of some relevance to note, however, that had I used a discount rate of 10.8%—which is the midpoint between the experts' diverging discount rates—my DCF analysis would have resulted in a per share price for BMC of $46.44, closely consistent with the $46.25 Merger price.

### 3. Terminal Growth Rate

The Respondent's expert adopted the inflation rate as the Company's growth rate, but I did not find sufficient evidence in the record to support the application of a growth rate limited to inflation. In *Golden Telecom,* and again in *Towerview LLC v. Cox Radio, Inc.*,[149] this Court noted that inflation is generally the "floor" for a terminal value.[150] Testimony and documentary evidence are inconclusive on the Company's prospects for growth as of the time of the Merger. Ultimately, I find it most appropriate to follow this Court's approach in *Golden Telecom* and apply a terminal growth rate that is at the midpoint of inflation and GDP.

The Petitioners' expert purported to use this methodology, but arbitrarily opted to add 50 basis points to the midpoint of inflation and GDP, an approach I do not find supported in the record. Therefore, though I find the midpoint approach to be sound, I reject Steffen's addition of 50 basis points and use 3.25% as my growth rate.

I note that the Respondent's expert did an analysis of implied EBITDA growth rates for comparable companies, which he found to be an average of -1.7%.

---

[149] 2013 WL 3316186 (Del. Ch. June 28, 2013).

[150] *Id.* at *27 ("As noted, the rate of inflation generally is the "floor for a terminal value. Generally, once an industry has matured, a company will grow at a steady rate that is roughly equal to the rate of nominal GDP growth."); *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 511 (Del. Ch.) ("A viable company should grow at least at the rate of inflation and, as Golden's expert Sherman admits,[85] the rate of inflation is the floor for a terminal value estimate for a solidly profitable company that does not have an identifiable risk of insolvency."), *aff'd,* 11 A.3d 214 (Del. 2010).

I do not find there to be sufficient evidence of the true comparability of those companies such that the approach I am adopting, just discussed, is unreasonable.

### 4. Excess Cash

The Petitioners' expert used an excess cash figure as of the Merger date, while the Respondent's expert used a figure from the last quarterly report prior to the Merger. I found credible the testimony at trial that the Company was preserving its cash balance in contemplation of closing the Merger and that, but for the transaction, the Company would not have conserved an extra $127 million in cash.[151]

The Respondent's expert also made an adjustment to excess cash for the expense associated with repatriating cash held abroad. The Petitioners argued that this was inappropriate because the Company's 10-K stated its intent to maintain cash balances overseas indefinitely. These funds, however, represent opportunity for the Company either in terms of investment or in repatriating those funds for use in the United States, which would likely trigger a taxable event. Accordingly, I find it appropriate to include a reasonable offset for the tax associated with repatriating those funds.

---

[151] *See* Trial Tr. 114:11–115:1 (Solcher); *see also id.* 952:7–953:15 (Steffen) (noting that he was not aware of the Company's merger-driven conservation of cash before trial and did not account for it); *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *8 (Del. Ch. Apr. 30, 2012) ("This Court previously has rejected the proposition that changes to a company's capital structure in relation to a merger should be included in an appraisal.").

## 5. Stock-Based Compensation

It is abundantly clear to me that, as a technology company, BMC's practice of paying stock-based compensation is an important consideration in this DCF valuation. Both experts accounted for stock-based compensation, but only the Respondent's expert did so in a way that accounted for *future* stock-based compensation, which I find to be the reasonable approach. His approach was to treat estimated stock-based compensation as an expense, which I find reasonable in light of the Company's history of buying back stock awarded to employees to prevent dilution; in that sense, it is clearly in line with a cash expense. The Petitioners have argued strenuously that this overstates the cost, but they presented only the methodology of Steffen—which fails to account for future SBC—as an alternative. Accordingly, I adopt Ruback's calculation as it relates to stock-based compensation.

## 6. M&A Expense

The parties also disagreed as to whether so-called "tuck-in" M&A expenses should be deducted in calculating free cash flows. I find that the projections prepared by management and used throughout the sales process, including those projections that formed the basis for the fairness opinion, incorporated the Company's reliance on tuck-in M&A activity in their estimation of future growth and revenues. Those projections expressly provided a line-item explaining the

Company's expected tuck-in M&A expenses in each year of the projections, and the Company's CFO, Solcher, credibly testified that, because the Company planned to continue with its inorganic growth strategy had it remained a public company, he prepared the management projections with growth from tuck-in M&A in mind.[152] Thus, those projections are inflated if M&A, and its accompanying expense, is not taken into account in the valuation. Although it is not determinative of my analysis, I also note that the multiple potential buyers through the course of the Company's sales process must have similarly determined that tuck-in M&A was embedded in the Company's growth projections, or else those buyers would have been forgoing up to *$1.89 billion* in value by not topping the Buyer Group's winning bid. In any event, because I find that management's projections incorporated M&A in their forecast of future performance, the expenses of that M&A must be deducted from income to calculate free cash flow.

### 7. Conclusion

Taking all of these inputs and assumptions together, I conducted a DCF analysis that resulted in a per share price for BMC of $48.00.[153]

---

[152] *See* Trial Tr. 92:12–23 (Solcher) ("Q: And when you prepared those projections, were you assuming there would be revenue through companies bought through tuck-in M&A? A: We did. Q: If you had not assumed that there would be such tuck-in M&A, would the revenues you were showing have been higher or lower? A: Lower."); *id.* at 119:7–120:15 (Solcher).

[153] Because I ultimately rely on deal price here, I will not attempt to set out my DCF analysis in further detail.

*B. The Merger Price*

Having found a DCF valuation of $48.00, I turn to other "relevant factors" I must consider in determining the value of BMC. Neither expert presents a value based on comparables, although Ruback did such an analysis as a check on his DCF. Thus, I turn to consideration of the merger price as indication of fair value. As our Supreme Court recently affirmed in *Huff Fund Investment Partnership v. CKx, Inc.*,[154] where the sales process is thorough, effective, and free from any spectre of self-interest or disloyalty, the deal price is a relevant measure of fair value. Even where such a pristine sales process was present, however, the appraisal statute requires that the Court exclude any synergies present in the deal price—that is, value arising solely from the deal.

### 1. The Sales Process Supports the Merger Price as Fair Value

The record here demonstrates that the Company conducted a robust, arm's-length sales process, during which the Company conducted two auctions over a period of several months. In the first sales process, the Company engaged at least five financial sponsors and eight strategic entities in discussing a transaction from late August 2012 through October 2012. As a result, the Company received non-binding indications of interest from two groups of financial sponsors: one for $48 per share and another, from a group led by Bain, for $45-$47 per share. Ultimately

---

[154] 2015 WL 631586 (Del. Feb. 12, 2015), *aff'g* 2013 WL 5878807 (Del. Ch. Nov. 1, 2013).

the Company decided at the end of October to discontinue the sales process based on management's confidence in the Company's stand-alone business plan, which was temporarily bolstered by positive second quarter financial results.

However, when the Company returned to underperforming in the third quarter, it decided to reinitiate the sales process. In the second sales process, which was covered in the media, the Company reengaged potential suitors that had shown interest in acquiring the Company in the previous sales process, from late January 2013 through March 2013. As a result, the Company received non-binding indications of interest from three different groups of financial sponsors in mid-March, one for $42-$44 per share, one from the Buyer Group, led by Bain, for $46-47 per share, and one from the Alternate Sponsor Group for $48 per share. Negotiations with the low bidder quickly ended after it refused to raise its bid. The Company, therefore, proceeded with due diligence with the two high bidders through April 2013, distributing a draft merger agreement to them, and setting the deadline for the auction process at April 22, 2013.

On April 18, 2013, just days before the impending deadline, one of the sponsors in the Alternate Sponsor Group backed out of the auction and the remaining financial sponsor explained that it could no longer support its prior indication of interest but was considering how to proceed in the auction at a valuation closer to the stock's then-current trading price of $43.75. The Company

agreed to extend the auction deadline at the request of the Alternate Sponsor Group in an attempt to maintain multiple bidders. On April 24, the Buyer Group submitted an offer of $45.25 per share. The remaining financial sponsor told the Company that it was still interested in the auction, but that it would need an additional month to finalize a bid and reiterated that if it did ultimately make a bid, it would be below the initial indication of interest from the Alternative Sponsor Group. On April 26, the Company successfully negotiated with the Buyer Group to raise its offer to $45.75 per share, and then to raise its offer again, on April 27, to $46.25 per share.

On May 6, 2013 the Company announced the Merger agreement, which included a bargained-for 30-day market check or "Go Shop," running through June 5. As part of the Go Shop process, the Company contacted sixteen potential bidders—seven financial sponsors and nine strategic entities—but received no alternative offers.

The sales process was subsequently challenged, reviewed, and found free of fiduciary and process irregularities in a class action litigation for breach of fiduciary duty. At the settlement hearing, plaintiffs' counsel noted that the activist investor, Elliot, had pressured the Company for a sale, but agreed that the auction itself was "a fair process."

I note that the Petitioners, in their post-trial briefing, attempt to impugn the

effectiveness of the Company's sales process on three grounds. First, the Petitioners argue that Elliot pressured the Company into a rushed and ineffective sales process that ultimately undervalued the Company. However, the record reflects that, while Elliot was clearly agitating for a sale, that agitation did not compromise the effectiveness of the sales process. The Company conducted two auctions over roughly the course of a year, actively marketed itself for several months in each, as well as vigorously marketed itself in the 30-day Go Shop period. The record does not show that the pre-agreement marketing period or the Go Shop period, if these time periods can be said to be abbreviated, had any adverse effect on the number or substance of offers received by the Company. In fact, the record demonstrates that the Company was able to and did engage multiple potential buyers during these periods and pursue all indications of interest to a reasonable conclusion. The Petitioners' argument that Elliot could force the Company to carry out an undervalued sale is further undermined by the fact that the Company chose not to pursue the offers it received in the first sales process, despite similar agitations from Elliot, because management was then confident in the Company's recovery. In sum, no credible evidence in the record refutes the testimony offered by the Company's chairman and CEO, which testimony I find to be credible, that the Company ultimately sold itself because it was underperforming, not because of pressure from Elliot. The pressure from Elliot,

41

while real, does not make the sales price unreliable as an indication of value.

Second, the Petitioners argue that the Company's financial advisors were leaking confidential information about the sales process to the Buyer Group, allowing it to minimize its offer price. For this contention the Petitioners rely solely on a series of emails and handwritten notes prepared by individuals within the Buyer Group, which purport to show that the Buyer Group was getting information about the Alternate Sponsor Group from a source inside Bank of America, one of the Company's financial advisors.[155] As a preliminary matter, I don't find sufficient evidence to conclude that the Company's financial advisors were actually leaking material information to the Buyer Group. But even if that could be sustained by the emails and handwritten notes presented by the Petitioners, nothing in those documents or elsewhere in the record shows that the Buyer Group had any knowledge as to the Alternate Sponsor Group's effective withdrawal from the sales process leading up to the bid deadline. To the contrary, the argument that the Buyer Group did have such information is directly contradicted by the actual actions of the Buyer Group, which increased its bid for the Company twice after its initial submission despite being (unbeknownst to the Buyer Group) the lone bidder in the auction. At trial, Abrahamson, the Bain principal leading the BMC deal, credibly testified that the Buyer Group raised its

---

[155] *See* Trial Tr. 489:20–526:1; JX 497.

bid multiple times because it believed the auction was still competitive and that the Buyer Group did not learn it was the only party to submit a final bid until it viewed the draft proxy after executing the Merger agreement. And in fact, the emails and notes relied upon by the Petitioners actually indicate that at the time the Buyer Group submitted its bid, it had no idea where the Alternate Sponsor Group stood and was seeking out that information.[156] Even as far along as April 29, 2013, two days after the Buyer Group had raised its bid for the second and final time, emails within the Buyer Group show that it believed the Alternate Sponsor Group was still vying for the Company.[157] Therefore, I do not find that the sales process was compromised by any type of "insider back-channeling."

Finally, the Petitioners argue that the same set of emails and notes from within the Buyer Group show that the Company made a secret "handshake agreement" or "gentleman's agreement" with the Buyer Group after receiving its final offer of $46.25 per share that the Company would not pursue any other potential bidders, including the Alternate Sponsor Group. The Petitioners allege that this handshake agreement prevented the Company from further extending the auction deadline to accommodate the additional month requested by the Alternate Sponsor Group and thus precluded a second bidder that would have maximized value in the sales process. Again, I note as a preliminary matter that I do not find

---

[156] *See* JX 497.
[157] *See id.* at Tab F; Trial Tr. 665:21–667:3.

that the Petitioners have sufficiently proven the existence of such a so-called handshake agreement. But in any case, even if the Company had made such an agreement, the record shows that by the time such an agreement would have been made the Alternate Sponsor Group had already notified the Company that one of its members had dropped out, that it could no longer support the figure in its prior indication of interest, and that if it was going to make a bid, that bid would come in closer to $43.75. I also note that by this time the Company had already extended its initial auction deadline by several days to accommodate the Alternate Sponsor Group. Finally, the Alternate Sponsor Group could have pursued a bid during the ensuing go-shop period, but did not do so. In light of these facts, the Company's decision not to wait the additional month requested by the Alternate Sponsor Group before moving forward with the only binding offer it had received was reasonable and does not to me indicate a flawed sales process.

For the reasons stated above, I find that the sales process was sufficiently structured to develop fair value of the Company, and thus, under *Huff*, the Merger price is a relevant factor I may consider in appraising the Company.

### 2. The Record Does Not Demonstrate that the Merger Price Must be Reduced to Account for Synergies in Calculating Fair Value

The appraisal statute specifically directs me to determine fair value "exclusive of any element of value arising from the accomplishment or expectation

44

of *the merger . . . .*"[158] The Court in *Union Illinois 1995 Investment LP v. Union Financial Group, Ltd.*[159] thoughtfully observed that this statutory language does not itself require deduction of synergies resulting from the transaction at issue, where the synergies are simply those that typically accrue to a seller, because "such an approach would not award the petitioners value from the particular merger giving rise to the appraisal" but instead would "simply give weight to the actual price at which the subject company could have been sold, including therein the portion of synergies that a synergistic buyer would leave with the subject company shareholders as a price for winning the deal."[160] Instead, the mandate to remove all such synergies arises not from the statute, but from the common-law interpretation of the statute to value the company as a "going concern."[161] Mindful that this interpretation is binding on me here, to the extent I rely on the merger price for fair value, I must deduct from the merger price any amount which cannot

---

[158] 8 *Del. C.* § 262(h) (emphasis added).

[159] 847 A.2d 340 (Del. Ch. 2003).

[160] *Id.* at 356.

[161] *Id.* The well-known standard that requires a corporation to be valued as a going concern was established over 65 years ago in *Tri-Continental Corp v. Battye*, where the Supreme Court declared that the appraisal statute entitles a dissenting stockholder "to be paid for that which has been taken from him, viz., his proportionate interest in a going concern." 74 A.2d 71, 72 (Del. 1950); *see, e.g.*, *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 220 (Del. 2005) (citing *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996)). However, the Court in *Tri-Continental* also described what the stockholder is entitled to receive as the "intrinsic value" of his stock, which, I note, may not be equal to the going-concern value of the corporation. *See* 74 A.2d at 72.

be attributed to the corporation as an independent going concern,[162] albeit one which employs its assets at their highest value in that structure.[163] Understanding that such synergies may have been captured by the sellers in the case of a strategic acquirer is easily comprehended: if company B, holding a patent on the bow, finds it advantageous to acquire company A, a manufacturer of arrows, synergies could result from the combination that would not have composed a part of the going-concern *or* the market value of company A, pre-merger (and excluding merger-specific synergies). In other words, company B's patent on the bow might make it value company A more highly than the market at large, but that patent forms no part of the property held by the stockholders of company A, pre-merger. Assuming that the record showed that the acquisition price paid by company B included a portion of this synergistic value, this Court, if relying on deal price to establish statutory fair value, would be required to deduct that portion from the appraisal award.

Here, the acquisition of BMC by the Buyer Group is not strategic, but financial. Nonetheless, the Respondent alleges that synergistic value resulted from the acquisition, and that if the Court relies on the purchase price to determine fair value, those synergies must be deducted. They point to tax savings and other cost

---

[162] *See Union Illinois*, 847 A.2d at 356 (stating the Court is bound to employ "going concern" valuation).

[163] *See ONTI v. Integra Bank*, 751 A.2d 904, 910–11 (Del. Ch. 1999) (stating that valuation using assets at highest use is consistent with case law interpreting appraisal statute).

savings that the acquirer professed it would realize once BMC is a private entity. If I assume that inherent in a public company is value, achievable via tax savings or otherwise, that can be realized by an acquirer—any acquirer—taking the company private, such a savings is logically a component of the intrinsic value owned by the stockholder that exists regardless of the merger. Therefore, to the extent some portion of that value flows to the sellers, it is not value "arising from . . . the merger," and thus excludable under the explicit terms of the statute; but is likely properly excluded from the going-concern value, which our case law has explained is part of the definition of fair value as I must apply it here.[164] However, as discussed below, to the extent value has been generated here by taking BMC private, the record is insufficient to show what, if any, portion of that value was included in the price-per-share the Buyer Group paid for BMC.

During trial and in post-trial briefing, Respondent offered the testimony of a Bain principal to show that the Buyer Group would have been unwilling to pay the Merger price had they not intended to receive the tax benefits and cost reductions associated with taking the Company private. In fact, had these savings not existed,

---

[164] *See In re Sunbelt Beverage S'holder Litig.*, 2010 WL 26539 (Del. Ch. Feb. 15, 2010) (holding increased value inherent in taking company from a C corp. to an S corp. not recoverable as "fair value"). It is interesting to compare *Sunbelt* with *ONTI*, 750 A.2d at 910-11, and to note that non-speculative increases in value that could be realized by a company as a going concern—even though management may have eschewed them—are part of fair value; but non-speculative increases in value requiring a change in corporate form are excluded from fair value: this is an artifact of the policy decision to engraft "going concern" valuation onto the explicit language of the appraisal statute itself. See *Union Illinois,* 847 A.2d at 356.

the Buyer Group would have been willing to pay only $36 per share, an amount that resembles the going-concern value posited by Respondent's expert. However, demonstrating the acquirer's internal valuation is insufficient to demonstrate that such savings formed a part of the purchase price. Here, the Respondent's expert did not opine on the fair value of the Company using a deal-price-less-synergies approach. Instead, the Respondent offered only the testimony of the buyer and its internal documents to show that the purported synergies were included in their analysis. While it may be true that the Buyer Group considered the synergies in determining their offer price, it is also true that they required a 23% internal rate of return in their business model to justify the acquisition,[165] raising the question of whether the synergies present in a going-private sale represent a true premium to the alternatives of selling to a public company or remaining independent. In other words, it is unclear whether the purported going-private savings outweighed the Buyer Group's rate of return that was required to justify the leverage presumably used to generate those savings.

When considering deal price as a factor—in part or in toto—for computing fair value, this Court must determine that the price was generated by a process that likely provided market value, and thus is a useful factor to consider in arriving at fair value. Once the Court has made such a determination, the burden is on any

---

[165] Trial Tr. 719:4–720:5 (Abrahamson).

party suggesting a deviation from that price to point to evidence in the record showing that the price must be adjusted from market value to "fair" value.[166] A two-step analysis is required: first, were synergies[167] realized from the deal; and if so, were they captured by sellers in the deal price? Neither party has pointed to evidence, nor can I locate any in the record, sufficient to show what quantum of value should be ascribed to the acquisition, in addition to going-concern value; and if such value was available to the Buyer Group, what portion, if any, was shared with the stockholders. I find, therefore, that the Merger price does not require reduction for synergies to represent fair value.

*C. Fair Value of the Company*

I undertook my own DCF analysis that resulted in a valuation of BMC at $48.00 per share. This is compared to, on the one end, a value of $37.88 per share offered by the Respondent, and on the other, a value of $67.08 per share offered by the Petitioners. Although I believe my DCF analysis to rely on the most appropriate inputs, and thus to provide the best DCF valuation based on the information available to me, I nevertheless am reluctant to defer to that valuation in this appraisal. My DCF valuation is a product of a set of management projections, projections that in one sense may be particularly reliable due to BMC's subscription-based business. Nevertheless, the Respondent's expert,

---

[166] *Merlin P'ship v. AutoInfo, Inc.* 2015 WL 2069417 (Del. Ch. Apr. 30 2015).
[167] Of course, the Petitioner may point to market distortions imposed on the sellers as well.

49

pertinently, demonstrated that the projections were historically problematic, in a way that could distort value. The record does not suggest a reliable method to adjust these projections. I am also concerned about the discount rate in light of a meaningful debate on the issue of using a supply side versus historical equity risk premium.[168] Further, I do not have complete confidence in the reliability of taking the midpoint between inflation and GDP as the Company's expected growth rate.

Taking these uncertainties in the DCF analysis—in light of the wildly-divergent DCF valuation of the experts—together with my review of the record as it pertains to the sales process that generated the Merger, I find the Merger price of $46.25 per share to be the best indicator of fair value of BMC as of the Merger date.

### III. CONCLUSION

As is the case in any appraisal action, I am charged with considering all relevant factors bearing on fair value. A merger price that is the result of an arm's-length transaction negotiated over multiple rounds of bidding among interested buyers is one such factor. A DCF valuation model built upon management's projections and expert analysis is another such factor. In this case, for the reasons above, I find the merger price to be the most persuasive indication of fair value

---

[168] Had I used a discount rate equal to the median of the rates suggested by the parties' experts, but kept my other inputs the same, my DCF value would be remarkably close to the deal price. *See supra* note 148.

available.   The parties should confer and submit an appropriate form of order consistent with this opinion.